JjDREW, J.
In this long-running action to reduce donations, plaintiffs appeal an interlocutory judgment setting forth the donations to be fictitiously added to the estate in order to determine the forced portion. We affirm the judgment in part, reverse the judgment in part and remand this matter to the trial court.

FACTS

Decedent James Adams (“Mr. Adams”) fathered one child, Elizabeth Ann Adams Moorman, who was born on June 29, 1935. Mr. Adams divorced Ann Moorman’s mother in September of 1942. At the time of his death on April 27, 1985, Mr. Adams was survived by his daughter, Ann Moor-man and his sisters, Mary Adams (“Miss Adams”) and Roberta Talley (“Mrs. Talley”). Mrs. Talley, married to Sam Talley, is the mother of Joseph Talley and Thomas Talley. Miss Adams never married or had any children. All of the aforementioned individuals with the exception of Ann Moorman are collectively referred to in this opinion as the “Adamses.” The Adamses lived together in one household.
Decedent, who died testate and bequeathed to his daughter only her forced portion, allegedly possessed no significant assets on the date of his death despite at one time owning one-half of what can accurately be described as a lucrative gambling business.[1] Although many crucial financial records pertaining to James Adams and his family have been destroyed or discarded, the record before us is replete with testimony providing a rich history of the financial successes and failures of the Adamses.

*473
19The Red Onion

As early as the 1920’s, the Adamses operated the Red Onion restaurant in Monroe. All the members of the family worked at this restaurant which especially flourished during World War II as it was near a military base, Selman Field, that provided a steady stream of customers. Although the Adamses’ mother owned the Red Onion, everyone considered Mr. Adams to be the person who ran the restaurant because as the only surviving son he was the primary male figure in the family.
Apparently none of the family members received a salary for working at the restaurant. Instead, because the operation of the restaurant was a joint effort, each family member simply took whatever money they needed when they needed it. Cash proceeds from the restaurant were taken by the mother to their house behind the restaurant, where the Adamses all lived together until moving in 1961.
By the 1950’s, business at the Red Onion had slowed due to a variety of reasons. Mr. Adams became less involved in the restaurant and began engaging in different business ventures. Mrs. Talley ceased working at the restaurant in 1960 to care for her mother. Miss Adams and her brother-in-law Mr. Talley continued to operate the Red Onion until they decided to lease it in 1968, which they did for ten years. The Red Onion caught fire in 1980.

Quaker Motel

In 1944, Mr. Adams and Mitchell Bruno joined forces to purchase the Quaker Motel. Mr. Bruno agreed to run the motel in return for Mr. |sAdams providing the $4,000 needed as a down payment to buy it. Mrs. Talley recalled that her mother gave her brother this down payment. The partnership received a loan for an additional $4,000.
The Quaker Motel was incorporated on August 14, 1962 when Mr. Adams became fearful of being sued after a motel guest died from asphyxiation. Mr. Adams received 230 shares, Mr. Bruno received 229 shares and Mr. Bruno’s wife received one share of the 460 shares of Quaker Motel stock. In April of 1966, Mr. Adams placed his 230 shares in the name of his sister Miss Adams by endorsing the stock certificate to her. When Mr. Adams first informed Mr. Bruno of his plans to transfer his stock to Miss Adams, Mr. Bruno responded that he did not want to have a female as his business partner. Mr. Adams reassured Mr. Bruno that he would still be dealing only with Mr. Adams, which is what ultimately happened.
Quaker Motel was sold on February 23, 1983 for $170,000. Mr. Bruno testified in his deposition that he did not discuss the sale with Miss Adams, who received a check for $82,673. Mr. Bruno and Miss Adams also divided over $19,000 that Quaker Motel had in its bank accounts at the time of the sale.

A & C Music

In 1954, Louis Costanza gave Mr. Adams 50% of his amusement machines business in return for Mr. Adams’ signature on a $25,000 note. Their joint-venture was given the name of A & C Music. Mr. Adams agreed to handle the financial side of the business while Mr. Costanza secured the locations at which their machines, some of which offered gambling, were to |4be placed. The business was so profitable that they were able to repay the $25,000 note within a year.
During the late 1950’s, the machines produced between $7,000 and $8,000 and sometimes as much as $10,000 in weekly revenues. Mr. Costanza described a safe measuring approximately six feet by three feet located in the company’s office. According to Mr. Costanza, at times cash and *474 coins were “scattered all over the floor after the safe was full” because the business was doing so well. Mr. Costanza provided some additional interesting information about A & C Music during his deposition:
Q: All right. This indicates that for the year ending 12-31, 1970, the business had a net loss of fourteen hundred, ninety-three dollars and sixteen cents ($1,493.16). So, you were losing money. Would that be correct?
A: We lost money every year, but we made money, too.
Q: What you’re indicating by that answer, I would presume, Mr. Costan-za, is that you were not reporting all of the taxable income of the business?
A: Not reporting. That’s right.
Q: Cash?
A: Cash.
Leonard Webb was the accountant for A & C Music, A & C Realty, the Quaker Motel and the Adamses. He described how he would see substantial amounts of money at A & C Music’s offices, but most of what he saw were bags of coins.
Mr. Adams and Mr. Costanza sometimes loaned money to others so they could operate bars or nightclubs where A & C Music could place its machines. Mr. Costanza remembered back-room gambling at clubs ^operated by a man named Willie T. Mr. Adams and Mr. Costanza apparently had a cut of this action because Mr. Costanza testified how on each Sunday night the money from Willie T’s clubs was brought to the A & C Music office and Mr. Adams would divide the money.
A & C Music was incorporated on February 28, 1962 as a subchapter-S corporation. Mr. Adams and Mr. Costanza were each issued 19 shares of stock; Miss Adams and Mrs. Costanza were each given one share of stock. In March of 1962, Mr. Adams transferred 18 of his shares to Miss Adams. Mr. Costanza believed that Mr. Adams did this because of the death at the Quaker Motel and because a conflict of interest arose due to Mr. Adams’ appointment to the Louisiana Alcohol Beverage Control Board (“ABC”).[2]
Despite Miss Adams’ becoming a shareholder owning nearly 50% of the shares, it remained business as usual at A & C Music. Miss Adams conceded that Mr. Adams still ran the business, which is not unusual considering she had none of her money invested in A & C Music. Mr. Costanza testified that he never had any dealings with Miss Adams regarding A & C Music. Mr. Adams and Mr. Costanza continued to incur obligations on behalf of the corporation by endorsing notes. When the finances of A & C Music became too difficult for Mr. Adams to handle on his own, his girlfriend Paula Kennimer was hired as bookkeeper in 1964. Ms. Ken-nimer recalled that she only witnessed Miss Adams coming to the office in order to pick up Mr. Adams. Ms. Kennimer testified that Mr. RAdams and Mr. Costan-za continued to make the decisions affecting A & C Music.
Ms. Kennimer described A & C Music as being in good financial shape when she began working there in 1964. However, A & C Music’s business prospects began to diminish when the federal government started requiring $250 tax stamps on the machines. Machines lacking the stamp were seized and destroyed by the Internal *475 Revenue Service. Soon thereafter, A & C Music was limited to placing only one machine at each location and that location had to be a bar or nightclub. Eventually the gambling machines were outlawed in the late 1960’s. Mr. Webb testified that these actions by the federal government resulted in substantial losses for the business.
The movable property and trade-name of A & C Music were acquired by TAC Amusement in 1971. Mr. Costanza testified that he became interested in selling A & C Music because he had returned from Europe to find the corporation in a mess and he did not care to expend the energy to rebuild it. Miss Adams was not involved in the sale negotiations. TAC agreed to assume $125,000 of the $132,321 debt owed by A & C Music on open accounts and chattel mortgages. In addition, the shareholders of A & C Music were to receive a total of $175,000 in non-competition money.[3] Following the sale, Mr. Adams worked for TAC earning $200 a week until his death in 1985.
|7A & C Music was certainly not run in accordance with normal business accounting practices prior to the date it was incorporated. Mr. Webb testified that when A & C Music was still a partnership, it did not have a bank account. In order for Mr. Webb to prepare the tax returns, Mr. Cos-tanza and Mr. Adams would tell him how much income had been generated and how much had been paid in expenses. Invoices for expenses that had been retained were kept in a paper bag. Sometimes expenses would be written on pieces torn from a grocery bag. Mr. Webb accepted what he was told was A & C Music’s income for the year and subtracted the expenses that he found in the bag.

A&C Realty

Mr. Costanza and Mr. Adams together purchased numerous pieces of immovable property using revenues generated by A & C Music, although the property was hardly ever titled in A & C Music after the sale. A bank account in the name of A & C Realty was set up to manage the property. Mr. Costanza related that he would find 90% of the properties, then he and Mr. Adams would go to the bank to sign notes to finance the purchase. Mr. Costanza still dealt only with Mr. Adams when acquiring these properties even if Mr. Adams chose to name one of his sisters as co-vendee. According to Mrs. Talley, Mr. Adams often put his interest in the purchased property under Miss Adams’ name because she had never married and did not have a husband to look out for her interests.
Miss Adams never visited the properties that were put in her name, nor did she talk to the vendors because her brother handled the sales | snegotiations. Her nephew Joseph Talley recalled bringing deeds to his aunt and mother for their signatures, and they would sign the deeds without asking any questions. Joseph Talley stated that he collected rent and brought it to his uncle.
Mr. Costanza recalled that Mr. Adams transferred his interest in these properties into his sisters’ names after the death at the Quaker Motel. The record reflects that between June 7 and June 8 of 1965, there were six transactions in which property was sold by either A & C Music or Mr. Adams to his sisters in return for the assumption of debt.
Mr. Costanza collected the rent on the properties purchased by A & C Music and brought it to Ms. Kennimer for deposit *476 into the A & C Realty account. Mr. Adams would then write checks on this account for payment of taxes, expenses and mortgage notes on the properties. Mr. Costanza testified that all of the rental income from these properties was deposited into the A & C Realty account regardless of the names in which the properties were titled. Only Mr. Adams and Mr. Costanza had the authority to write checks on the account. Once a year the money in the account was divided, presumably between Mr. Adams and Mr. Costanza.
Mr. Costanza recalled that the proceeds from the sale of A & C Music were used to pay off any remaining notes on the property that he and Mr. Adams had purchased together. However, Ms. Kennimer testified that the sales consideration of $125,000 received from TAC was not sufficient to pay off the outstanding notes. In fact, it apparently was not enough to pay off amounts owed by A & C Music for equipment and parts. Nevertheless, in 19addition to the $125,000 in consideration received, $175,000 in non-competition money was also received from TAC. In November of 1983, Miss Adams and the Costan-zas partitioned the property that they held jointly and that had been purchased through A & C Music.

Monroe Cigarette Service

Mr. Adams and Mr. Costanza were also engaged in a joint-venture named Monroe Cigarette Service, which was incorporated on April 24, 1952. Mr. Costanza stated he was not very involved with Monroe Cigarette Service because Miss Adams worked there and he did not get along with her. Monroe Cigarette Service was eventually sold to TAC three to four years after the A & C Music sale because, as Mr. Costanza pointed out, the company lost a lot of money. Ms. Kennimer thought it was purchased by TAC for $29,000.
Mr. Webb prepared a financial statement on October 2, 1977 which showed that Mr. Adams had a net worth of $275,800. His stock in Monroe Cigarette Service was valued at $160,000 at the time. The statement showed Mr. Adams as owing no direct liabilities. Mr. Webb testified that the information on the financial statement was furnished to him by Mr. Adams, so Mr. Webb was not personally aware of the value of Monroe Cigarette Service on that date. A later financial report showed that Monroe Cigarette Service had a negative balance of $70,426 in 1979. Ms. Kennimer related that Monroe Cigarette Service lost over $191,000 and that Mr. Adams had borrowed from the bank the $85,000 that he had invested in the corporation.
linThere is much testimony from defendants essentially stating that Mr. Adams was a business failure. However, his accountant, Mr. Webb thought Mr. Adams was an astute and successful businessman. Even accepting defendants’ assertions that Mr. Adams was not a particularly good businessman, it is evident from the record that Mr. Adams clearly benefitted from hitching his wagon to two individuals, Mr. Bruno and Mr. Costanza, who were very adept, at making money.

PROCEDURAL HISTORY

Ann Moorman filed a petition for reduction of excessive donations on April 28, 1986. She died on January 28, 1989 and her five children were substituted as party plaintiffs. The parties agreed to bifurcate the case, with the trial court first determining which alleged inter vivos donations were to be fictitiously returned to the estate, and then at a later date, determining the value of those donations.
Testimony was heard in this matter in June of 1992. The trial court rendered judgment four years later on December 30, *477 1996, ordering some property to be fictitiously returned to the active mass:
— Compensation received by decedent from the ABC Board and donated to Miss Adams.
— The value of Miss Adams’ ownership share in the A & C Music stock and Quaker Motel stock donated by decedent to her.
— Properties titled in the name of Miss Adams and acquired through A & C Realty after the effective date of the sale of A & C Music.
— All rents collected after Mr. Adams’ death from properties titled in the name of Miss Adams and acquired through A & C Music and/or A & C Realty.
— Property sold by decedent to Mrs. Talley and which was paid for by A & C Music, along with rents collected from this property after decedent’s death.
In— Properties located at 104 Tippet St. and North 3rd St. that were donated to Ms. Kennimer, along with rents collected from these properties after decedent’s death.
Ordered not to be returned were:
— The value of autos and trips alleged to have been purchased by decedent for his sisters.
— Properties titled in the name of Miss Adams and paid for through A & C Music and/or A & C Realty prior to the effective date of the sale of A & C Music in 1971 because those properties are fruits of the A & C Music stock donated by decedent to Miss Adams.
— Property transferred to Miss Adams from parties other than decedent and which were not purchased through A & C Music.
— Property acquired by Mrs. Talley from parties other than decedent and which were not acquired through A & C Music, in addition to any rents collected on this property.
•— Property from decedent and others that was titled in the names of both Miss Adams and Mrs. Talley and rents from this property.
— Renunciation by decedent of his 1/3 interest in a succession.
— Gifts of cash and cars and payment of college expenses to Joe Talley and Tom Talley from decedent.
The trial court further concluded that all the property given to Ann Moorman by decedent and the entire sum of money given to her by her father in the form of money orders were to be credited against her forced portion.
An appeal was taken from this judgment in May 1997. By order dated April 2, 1998, the parties were directed to show cause why the appeal should not be dismissed as an unappealable partial judgment. On April 29, 1998, the appeal was dismissed. Apparently because there was some dispute among the parties over which specific properties or assets were to be fictitiously returned to the active mass according to the judgment, in an |12August 7, 1998 joint stipulation and a March 1, 2001 amended joint stipulation, the parties agreed as to whether or not particular assets were fictitiously returned to the mass estate according to the judgment.
In a July 27, 2001 judgment finalizing and clarifying the original judgment, the trial court accepted the original and amended joint stipulations, adopted them as part of its judgment, and rendered a final, appealable judgment as to the “liability” issue. Plaintiffs appealed this judgment. By order dated April 8, 2002, this court ordered the parties to show cause why this appeal should not be dismissed as *478 an unappealable partial judgment. After briefing by the parties, this court agreed on May 1, 2002 to accept the July 27, 2001 judgment as an appealable partial final judgment pursuant to La. C.C.P. art. 1915(B)(1).
Because this is an appeal from an interlocutory judgment, defendants would ordinarily not waive their right to appeal that portion of the judgment against them by not answering plaintiffs’ appeal. Nevertheless, as requested by this court in order for this unusual appeal to go forward, defendants have stipulated by letter dated May 21, 2002 that they will be bound by the interlocutory judgment setting forth the property to be fictitiously added to the estate.

DISCUSSION

Book III, Title II, Chapter 3 of the Louisiana Civil Code of 1870 (Of the Disposable Portion and its Reduction in Case of Excess) was revised, amended and reenacted by Acts 1996, No. 77, § 1. However, Mr. Adams died in 1985.
| ]SDonations inter vivos or mortis causa cannot exceed three-fourths of the property of the disposer, if he leaves, at his death, one child. La. C.C. art. 1493 (1870).[4] Any disposal of property, whether inter vivos or mortis causa, exceeding the quantum of which a person may legally dispose to the prejudice of a forced heir, is not null, but only reducible to that quantum. La. C.C. art. 1502 (1870).[5] To determine the reduction to which inter vivos or mortis causa donations are liable, an aggregate is formed of all the property belonging to the donor or testator at the time of his death; to that is fictitiously added the property disposed of by donation inter vivos, according to its value at the time of the donor’s death, in the state in which it was at the period of the donation. La. C.C. art. 1505.[6]

Fruits of A & C Music Stock

La. C.C. art. 1515 (1870) required that the donee restore the fruits of donations that exceeded the disposable portion only from the date of the donor’s death, if the demand for reduction was made within the year; otherwise, fruits were to be restored from the date of demand.
In its reasons for judgment, the trial court stated that it found some merit in defendants’ argument that because Miss Adams had an ownership interest in A & C Music due to the donation of stock, she should be able to keep the fruits of this donation, i.e., the property transferred through A & C Music to her. But the court concluded that this argument had merit only as to such properties acquired by Miss Adams prior to the 1971 sale of A & C luMusic because after 1971 the properties were acquired through A & C Realty, an entity in which Miss Adams had no interest. Plaintiffs argue in their first assignment of error that the trial court erred in reaching this conclusion.
We note from the outset that the trial court never specifically designated which properties were acquired through A & C Music or A & C Realty. Nevertheless, it is obvious that A & C Music was involved in an acquisition if A & C Music was the vendor or if a member of the Adams family and a Costanza were the vendees. The deeds for the properties designated as A-2, A-3 and A-4 recite that Mr. Adams conveyed an undivided one-half interest to Ms. Adams. Nonetheless, the deeds for A-3 and A-4 both reflect the assumption of one-half of the balance due on a promis *479 sory note previously executed by Mr. Adams and Mr. Costanza. The deed for A-2 does not state this, yet it was one of the properties received by the Costanzas in the November 18, 1983 partition. Thus, the properties represented as A-2, A-3 and A-4 were acquired through A & C Music.
The deed for property A-5 recites that Mr. Adams conveyed six lots to Miss Adams for cash in hand. These lots were not listed in the partition and from our examination of the record there is no indication that the property designated A-5 was purchased with the assets of A & C Music. Therefore, the lots listed under A-5 will not be considered as property involving A & C Music and will be discussed later in the opinion.[7]
|15It is apparent that Miss Adams was in no manner involved in the acquisition of property by A & C Music. She had no knowledge of what A & C Music was buying, how it was being financed or how it was being paid. Property was purchased and paid for with A & C Music’s income and was usually placed in the names of individual shareholders.
Plaintiffs first argue that these properties were not purchased through A & C Music. Plaintiffs next argue that the transfer of A & C Music stock was a transfer in name only and, therefore, being an absolute simulation and not a true donation, the stock was incapable of generating fruits. It is unnecessary to discuss these two arguments as there is merit in plaintiffs’ third argument that the purchases of real estate with proceeds from A 6 C Music were not fruits of the A & C Music stock. Thus, we find error in the trial court’s characterization of the properties purchased by A & C Music prior to 1971 and placed in the name of Miss Adams as being fruits of that stock.
La. C.C. art. 551 provides that fruits are “things that are produced by or derived from another thing without diminution of its substance.” Article 551 further defines civil fruits as being “revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions.” Our emphasis. A cash dividend declared during the existence of a usufruct belongs to the usufructuary; however, stock dividends declared during the existence of the usufruct belong to the naked owner subject to the usufruct. La. C.C. art. 552. See also Daigre v. Daigre, 228 La. 682, 83 So.2d 900 (La.1955) for a discussion of the distinction between cash dividends and stock dividends.
The property purchased with A & C Music’s income cannot be considered a fruit for several reasons. First, these purchases depleted the assets of that corporation; because A & C Music was primarily a cash business, this was a diminution of its substance. Second, the corporate income was not distributed as a cash dividend. Instead, the income was used to purchase immovable property that was titled in Miss Adams’ name. Third, unlike a dividend, the acquired property was certainly not distributed in proportion to the stock ownership. Most notably, none of the acquired property was titled in Mr. Adams’ name even though he apparently still owned one of the 40 shares. Roberta Talley became co-owners with Louis Cos-tanza in two properties (B-l and F-l) even though she owned no shares of stock. Mrs. Costanza, who owned one share, was *480 the co-vendee along 'with Miss Adams on properties E-2, E-14 and E-16.
The court erred as a matter of law in construing the following properties as being “fruits” of the A & C Music stock: A-2, A-3 and A-4; E-l through E-7, E-9, E-10, E-12 through E-l7, and E-19; and G-l and G-2. Accordingly, we reverse the judgment insofar as it excluded these properties when calculating the active mass.
We add that the trial court was correct in not ordering the fictitious return of the rents collected prior to Mr. Adams’ death from these properties that were acquired through A & C Music before 1971.[8] These rents are fruits 117of the immovable property donated from Mr. Adams (whether acting as vendor or paying the consideration with A & C Music assets) to Miss Adams. This was recognized by the plaintiffs in the conclusion to their appellate brief: “As shown above, all of the gifts and transfers of property by James Adams to his sisters and others were excessive donations and simulated sales, which, along with the rent earned on any of these properties after James Adams’ death, must be returned to the fictitious estate.” Our emphasis. We further note this is also consistent with the trial court’s treatment of Roberta Talley in this regard. Mrs. Talley was ordered to fictitiously return the rents collected after Mr. Adams’ death on the properties that Mr. Adams “sold” to her and which were paid for by A & C Music.

Properties sold to Mary Adams and/or Roberta Talley

The trial court ruled that the properties from Mr. Adams and others that were titled in the names of both Miss Adams and Mrs. Talley were not to be returned to the fictitious estate. In its reasons for judgment, the court stated that the evidence was insufficient to establish these transfers of property as disguised donations. The trial court added that a determination that the properties were donated cannot be drawn from the lack of documentation of payments by Miss Adams and Mrs. Talley. The properties designated as C-l, C-2, C-4, I — 1, 1-2 and 1-3 fall under this category.
| iSPlaintiffs object to the trial court’s reasoning and conclusions, arguing that Mr. Adams’ pattern of conduct established the legal presumption that the transactions were disguised donations and shifted the burden of proof to the defendants. In support of their argument, plaintiffs cite Wilson v. Progressive State Bank & Trust Company, 446 So.2d 867 (La.App. 2d Cir.1984):
A simulation may be proved by indirect or circumstantial evidence since, by its inherent nature, a simulation often only admits of circumstantial proof. The burden of proof is ordinarily placed upon he who attacks a sale as a simulation. However, when a legal presumption of simulation is applicable, the burden of proof shifts to the party to the sale to establish that it was authentic and not merely a simulation. Louisiana law contains both a codal and a jurispru-dentially based presumption of simulation. The codal presumption emanates from Civil Code Article 2480 and is applicable where the vendor retains possession of the thing sold under usu-fruct or precarious title. The jurisprudential presumption is applicable where *481 the evidence establishes the existence of facts and circumstances which create a highly reasonable doubt as to the reality of the putative sale. Where either the codal or jurisprudential is applicable, the burden of proof shifts to the party to the purported sale to establish its actuality. To rebut this presumption, the party to the purported sale must establish a good faith transaction resulting in a true alienation of ownership for consideration.
Citations omitted. Wilson, 446 So.2d at 869.
The presumption of simulation does not apply in this case. The mere fact that Mr. Adams transferred other properties to his sisters without consideration being paid does not mean that every single sale involving his sisters is somehow blanketed with the presumption of a relative or absolute simulation.[9] Moreover, the pattern of conduct exhibited by Mr. Adams | regarding the properties purchased through A & C Music does not automatically apply to all other transactions in which Miss Adams and Mrs. Talley were involved. Therefore, the burden of proof remained with plaintiffs and we will review the trial court’s factual findings under the manifest error standard of review.

Mary Adams

Miss Adams worked at Woolworth’s during the 1930’s before she began working at the Red Onion in 1940, where she stayed until her family ceased operating it in 1963. Miss Adams then worked at Monroe Cigarette Service until 1979. Mr. Cos-tanza testified that Miss Adams initially made $60 per week at Monroe Cigarette Service, but was making $100 per week when she left that employment in 1979. Ms. Johnnie Kelly, testifying on behalf of the plaintiffs as an expert CPA, estimated that Miss Adams earned weekly wages of approximately $80 during the time she was employed at Monroe Cigarette Service.
Ms. Kelly reviewed Miss Adams’ income tax returns from 1970 to 1985, which were the only returns of Miss Adams made available for her review. These returns showed that Miss Adams earned $73,474 in income and received $26,974 in unemployment compensation and social security during this period. She also inherited $25,000 from her aunt, Annie Creighton, in 1975. Ms. Kelly estimated that Miss Adams had about $8,000 deposited in the bank in 1970. Miss Adams admitted that in 1970 she did b.nnot keep much cash and had most of her money in the bank. At the time of decedent’s death, Miss Adams had $186,363 in her bank accounts.
Miss Adams also claimed, without supporting documentation, that she inherited $3,000 from a cousin in Texas, profited from a 20-year investment that began paying out in 1954, received $25,000 in insurance proceeds from a fire at the Red Onion and received rent from the Red Onion and the former family home behind it.
Ms. Adams testified that she received $20,000 from her mother in 1954. This was apparently money made by the family while operating the Red Onion. Miss Adams claimed her mother did this when she designated Miss Adams as the head of *482 the household, effectively making her the “boss” of the family. Mrs. Talley confirmed that her mother had named her sister as head of household.

The Talleys

Roberta Talley testified that she began working when she was 16 years old at Woolworth’s and a men’s clothing store. She first worked at the Red Onion in 1939. She ceased working there to care for her mother in 1960. Like her sister, Mrs. Talley inherited $25,000 from her aunt Creighton in 1975. Mrs. Talley also alleged that this aunt had given her money for college. Mrs. Talley further alleged that she received a total of $12,500 from two insurance policies that her mother had. Mrs. Talley’s son Tom recalled that his mother inherited $3,000 from a Texas relative. Mrs. Talley stated that she kept the money she earned from the Red Onion and received from her aunt for college in a savings account, and if she kept 1 n money at home, it would have been less than $1,000. The Talleys had over $62,000 in their bank accounts on the date of Mr. Adams’ death.
Sam Talley worked at A & C Music beginning in 1962 after leaving the Red Onion, where he had worked upon returning from military service during World War II. His job at A & C Music required him to go to businesses where A & C Music had machines and check on those machines. After A & C Music was acquired by TAC, he stayed with TAC until 1990. Mr. Costanza testified that Mr. Talley was making $125 per week when TAC purchased A & C Music and after that TAC paid Mr. Talley $150 per week.
Ms. Kelly estimated that Mr. Talley earned between $4,000 to $4,500 per year from 1962 to 1972. The Talleys’ tax returns from 1972 to 1985 were examined by Ms. Kelly, who testified that Mr. Talley earned $105,256 during this period. Ms. Kelly estimated the Talleys had a bank balance of about $10,000 in 1972.
Plaintiffs place great emphasis on Ms. Kelly’s broad conclusion that Miss Adams and Mrs. Talley lacked the income stream necessary for them to have afforded the properties they acquired and to have account balances of $186,363 and $62,000 respectively on the date of their brother’s death. Between 1962 and 1983, Miss Adams acquired properties costing almost $248,000 in cash and assumed debt; she sold $151,469 worth of properties from 1966 to 1984. The Talleys acquired 15 pieces of property between 1962 and 1979 costing them a total of $97,198 in cash and assumed debt; they sold four properties for a total of $15,850. Although the conclusions | indrawn by Ms. Kelly may apply to the total of all the properties acquired by Miss Adams and Mrs. Talley, this simply does not mean that they lacked the means to acquire any of these properties on their own. Such an assertion by plaintiffs ignores the fact that Miss Adams and Mrs. Talley each had assets which could have been used to legitimately purchases at least some of the properties at issue in this matter.

C-l: Old family home

This home behind the Red Onion was where the Adamses lived before they moved to a new home on Marie Place in 1961. On October 25, 1968, Mr. Adams conveyed his one-third interest in this home to his sisters for $2,500 cash. There is no question that Miss Adams and Mrs. Talley had the means to purchase Mr. Adams’ undivided interest in this home.

C-2: Willie T’s

Willie T. was the name of a gentleman who operated a bar at this location which was made up of ten lots. On August 11, 1975, Mr. Adams conveyed this property to his sisters for $9,500 cash and the assump *483 tion of a $11,850 note held by Ouachita National Bank and a $3,888 note held by Central Bank. Filed into the record was a check from Miss Adams dated August 12, 1975 that was payable to the Ouachita National Bank for $5,925.42. The check notation states it is for “Willie T’s Bar.” Miss Adams testified that she and her sister either had to buy the property and assume the mortgage or the bank was going to seize it. Miss Adams testified that she and Mrs. Talley paid off the remaining indebtedness on it.
| New family home
On September 20, 1961, Mr. Adams purchased a residence on Marie Place in Monroe for $37,000 in cash. That same day, Mr. Adams executed a $25,000 mortgage on the property. The Adamses lived there after moving from their residence on Adams St. On January 26, 1962, Mr. Adams conveyed this property to Miss Adams and Mrs. Talley for $12,500 cash and the assumption of the mortgage which had a remaining balance of $24,836.
Miss Adams and Mrs. Talley testified that they split the down payment to buy the house. They explained that they took up the mortgage because at that time it was easier for a male to get a mortgage. Miss Adams testified that she paid the monthly $179 note on this home in which the entire family lived because she was the “old maid” in an Irish family. However, she did not have copies of the checks that she used to pay the notes. Ms. Kelly admitted that because she only had later tax returns, she did not have the financial information with which she could determine whether or not in 1962 Miss Adams and her sister had the resources to make this purchase.
Plaintiffs argue that the codal presumption of simulation applies in this instance because Mr. Adams continued to live at the Marie Place home even after selling it to his sisters. La. C.C. art. 2480 (1870) provided that when “the thing sold remains in the possession of the seller, because he has reserved to himself the usu-fruct, or retains possession by precarious title, | j^there is reason to presume that the sale is simulated!!]”[10] We disagree with plaintiffs’ assertion that Mr. Adams remained in possession of the home because his sisters permitted him to continue living there. Such an action by the sisters was simply the peculiar way this family operated. Moreover, the evidence showed that the Marie Place home was the family’s co-owned property from the time of Mr. Adams’ initial purchase in his name. Thus, all of the family members’ continued possession before and after Mr. Adams’ sale to his sisters demonstrates that this presumption that arises from one party’s retention of possession is inapplicable. In addition, the evidence also demonstrates that the sisters paid an onerous consideration for the property.

Category I properties

James Adams was not the vendor in any of these three transactions. In I — 1, Miss Adams and Mrs. Talley acquired the property for $1,150 in cash on November 15, 1961. In 1-2, Miss Adams and Mrs. Talley acquired the property for $6,000 cash on October 13,1969. In 1-3, Miss Adams and Mrs. Talley acquired a lot from their Aunt Annie Creighton for $6,000 and “other *484 good and valuable consideration the receipt of which is hereby acknowledged.”
The trial court made a credibility determination and believed the sisters’ testimony regarding their payments for the C-l, C-2, C-4, I — 1, 1-2 and 1-3 properties. Plaintiffs’ position is that the sisters lacked the resources | ¡^required to purchase these properties. There was a clear commingling of money which began when no member of the family was paid for working at the Red Onion, but instead each took whatever they needed from the cash their mother kept at home. This was presumably done because the Adamses lived as an old-fashioned Irish family. While their mother was the matriarch of the family, Mr. Adams was the dominant male figure. When the mother became too old to fulfill this role, Miss Adams as the unmarried daughter became the head of household. Such a manner of living makes the delineation of assets extremely difficult. Nevertheless, it is clear that Miss Adams and the Talleys were hard-working individuals who acquired enough assets to make the disputed purchases. On this record, we cannot say the trial court was clearly wrong in excluding C-l, C-2, C-4, I — 1, 1-2 and 1-3 from the active mass.

Brains, Planes and Automobiles

In its reasons for judgment, the trial court stated that plaintiffs had not met their burden of proving that decedent paid for autos and trips for his sisters, Miss Adams and Mrs. Talley. Likewise, the trial court found insufficient evidence that Mr. Adams donated cash and cars to his nephews, Joseph Talley and Tom Talley, or paid for their college expenses. In their next assignment of error, plaintiffs argue that the trial court erred in not fictitiously adding back to the estate the cash, vehicles, college tuition and trips paid for or given by James Adams to his sisters and nephews.
Because James Adams did not drive, he often depended on his nephews, Joseph Talley (born in 1948) and Tom Talley (born in 1950), to Lfidrive him around and run errands for him. Mr. Adams cared a great deal for his nephews and treated them generously. Mr. Adams carried what his nephews described as a “wad” of cash and was not hesitant about frequently giving his nephews $100 for helping him.
Mr. Adams also wanted to ensure that his nephews had transportation around town. Mrs. Talley testified that her brother purchased one car for Tom and she thought two cars for Joseph. Tom received a new Chevrolet SS 396 while in high school. Joseph received at least an Impala Super Sport from his uncle.
Joseph Talley testified that family money paid for his and his brother’s college tuition and expenses at Northeast Louisiana University. However, he then testified that whatever money was made by the family was shared by the family. Of course, this could be construed to include money from their uncle. Mitchell Bruno recalled Mr. Adams saying that he was helping to send Joseph and Tom to school. In any event, it is clear that Mr. Adams paid at least some of his nephews’ college expenses. How much is not exactly clear but will be determined when the parties litigate the value of Mr. Adams’ donation.
The trial court was clearly wrong in finding that there was insufficient evidence that Mr. Adams gave gifts of cars and cash to his nephews and paid for their college expenses. Mr. Adams gave some gifts of cash to his nephews, although part of it may have been compensation for the assistance they provided to him. If that is the case, then because these were remunerative donations, the trial court will need to determine how much |?,7was donated and the value of the services rendered by the nephews. See La. C.C. art. 1513 (1870) *485 which provided, “Remunerative donations can never be reduced below the estimated value of the services rendered.” Mr. Adams also purchased one car for Tom Talley and two cars for Joseph Talley. Finally, Mr. Adams paid at least part of their college expenses. The judgment is reversed insofar as it excluded these donations from the active mass.
Miss Adams and Mrs. Talley made trips to Europe together in 1968, 1980 and 1981. The first trip was paid by their aunt. Joseph Talley testified that “family money” paid for the other two trips. Mr. Costan-za, who did not believe Miss Adams and Mrs. Talley had the money to maintain their lifestyles, recalled Mr. Adams saying that he needed to get some money so he could send his sisters to Europe. Miss Adams denied that Mr. Adams paid for any of these trips.
Mr. Costanza also testified that Mr. Adams took care of all the bills at the house and paid cash for cars for his sisters during the 1950’s and early 1960’s. This was denied by Miss Adams.
We cannot conclude that the trial court was clearly wrong in making a credibility determination and accepting Miss Adams’ testimony that her brother did not pay for the trips or the cars.

Gifts from James Adams to Ann Moor-man

Appellants argue in their final assignment of error that the trial court erred in ruling that the entire amount of the money orders received by Ann Moorman, totaling over $35,000, should be credited against her forced | ^portion because some of that money was used to pay the tuition of decedent’s grandchildren. The court found it was inconsequential that some of the money was used to pay for the education of Ann Moorman’s children because the money orders were made out to her and were not required to be used for tuition.
According to plaintiffs, decedent paid for their tuition at a private school which they attended after the public schools were integrated. Kay Jones testified that she attended the private school for one year, and believed the tuition was $100 per month. Arnold Moorman attended the private school for two years, Edwin Moor-man attended the private school for seven years, Timothy Moorman attended the private school for five years and Dennis Moorman attended the private school for seven years.
Filed into the record are original receipts from cashier’s checks and money orders sent by Mr. Adams to his daughter. According to Ms. Kennimer, they were mailed to Ann Moorman from 1967 to 1985 and totaled $35,521.33. She testified that some of this amount was to be used for the private school tuition of Mr. Adams’ grandchildren.
The court’s conclusion was not clearly wrong. Although some of these payments might have been used to pay for the grandchildren’s tuition, nonetheless, they were still a gift to Ann Moorman as they reduced her obligation for the tuition payments.

lasA-5 Property

We note that the property designated as A-5 does not fit into any of the categories addressed in the original judgment.[11] Regarding the properties in which Mr. Adams was the vendor, but that did not involve A & C Music, the judgment only *486 addressed those properties sold to both Miss Adams and Mrs. Talley. We are aware that the parties’ stipulated that A-5 was excluded from the active mass according to the judgment and the stipulations were adopted as part of the later judgment. Nevertheless, there is no ruling addressing the property designated by plaintiffs as A-5. Accordingly, on remand, in addition to valuing the donations to be fictitiously returned to the active mass, the trial court is to determine whether the A-5 property is also to be fictitiously returned. Of course, if A-5 is found to be have been purchased through A & C Music, then it is to be returned.

CONCLUSION

This matter is remanded to the trial court for the valuation phase of the trial. On remand, the trial court is also ordered to determine whether the A-5 property is to be fictitiously returned. The judgment is reversed insofar as it excluded the following properties from the mass estate: A-2, A-3 and A-4; E-l through E-7, E-9, E-10, E-12 through E-17, and E-19; and G-l and G-2. The judgment is also reversed insofar as it did not fictitiously return the following donations to the mass estate: The vehicles (one for Tom Talley and two for Joseph Talley) that Mr. Adams purchased for his |3nnephews; the gifts of cash that Mr. Adams gave to his nephews; and that portion of his nephews’ college tuition that Mr. Adams paid. In all other respects, the judgment is affirmed.

DECREE

With each party to bear their own costs, the judgment is REVERSED in part and AFFIRMED in part. This matter is REMANDED to the trial court for further proceedings consistent with this opinion.
CARAWAY, J., concurs with written reasons.
GASKINS, J., concurs with reasons set forth by Judge CARAWAY.

. Mary Adams testified that decedent had only a small checking account from which he paid his doctor bills.

. Mr. Adams gave his ABC paychecks to Miss Adams. Ms. Kennimer believed he was paid $7,000 per year.

. A lump-sum payment of $50,000 with the remaining $125,000 to be paid in annual installments of $25,000 beginning on January 1, 1972.

. As amended by Acts 1981, No. 884, § 1.

. As amended by Acts 1981, No. 765, § 1.

.As amended by Acts 1983, No. 656, § 1.

. We are cognizant that the lots described in A-5 are in the same Booker T. Washington addition as the lots described in A-6. The lots described in A-6 were fictitiously added to the estate, presumably because they were acquired after 1971. Nevertheless, this is not dispositive of how A-5 is to be classified.

. The trial court ordered the fictitious return of rents collected before Mr. Adams’ death on the properties titled in Ms. Adam's name and purchased through A & C Realty after 1971. These rents would likewise be fruits of the donations; however, defendants did not appeal or answer the appeal, so the trial court’s conclusion regarding these rents is not disturbed.

. A simulated sale does not transfer property; it occurs when the parties have no good faith intent to transfer ownership and is a sham. Wilson v. Progressive State Bank & Trust Co., 446 So.2d 867 (La.App. 2d Cir.1984). Such sham transactions, or absolute simulations, are distinguished from disguised donations, which "are conveyances intended by the parties to be valid but in which they have misrepresented the character of their transaction.” Comment (a) to La. C.C. art. 2026. A relative simulation, such as a disguised donation, occurs "when the parties intend that their contract shall produce effects between them though different from those recited in their contract.” La. C.C. art. 2027.

. La. C.C. art. 2480 was revised in 1993 and according to comment (a), "reproduces the substance of Article 2480 of the Civil Code of 1870.” The article now reads, "When the thing sold remains in the corporeal possession of the seller the sale is presumed to be a simulation, and, where the interest of heirs and creditors of the seller is concerned, the parties must show that their contract is not a simulation.”

. The court also ruled on properties transferred to Miss Adams or Mrs. Talley from parties other than decedent AND which were not bought through A & C Music, but the A-5 properties obviously do not fall into this category.